UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**EARL DOUGLAS WILKINS**,                                    Case No. 6:11-CV-00889-KI

                Petitioner,                                    OPINION AND ORDER

    v.

**JEFF PREMO**,

                Defendant.


        Kristina Hellman
        Assistant Federal Public Defender
        101 SW Main Street, Suite 1700
        Portland, OR 97204

                Attorney for Petitioner

        Ellen F. Rosenblum
        Attorney General
        Samuel A. Kubernick
        Assistant Attorney General

Page 1 - OPINION AND ORDER

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

      Attorneys for Defendant

KING, Judge:

Petitioner Earl Douglas Wilkins, an inmate incarcerated at the Oregon State Penitentiary,

brings this action, pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus.  For the reasons

set forth below, I deny the petition.

## BACKGROUND

On October 10, 1994, petitioner was indicted on five counts of aggravated murder, one

count of theft in the first degree, and one count of felon in possession of a firearm.  A jury

convicted petitioner on all counts.

At trial, the state's theory of the case was that petitioner purchased stolen stereo

equipment and, when he was confronted by the owner of the stolen items, Shango Wade,

petitioner shot Wade and his girlfriend, Deborah Payton.

The state presented evidence that, while Wade was in Beaverton on September 22, 1994,

his apartment was burglarized.  His friend discovered the burglary, called Wade, and Wade

returned to the apartment and called the police.  Wade and the friend then questioned a neighbor,

McComb, about what he may have seen.  Soon thereafter, McComb informed Wade that three

men were in a nearby alley carrying a television and stereo speakers from an abandoned house

and placing the equipment in a light blue Mercedes-Benz with a diesel engine.  Wade and the

friend pursued the men in two separate cars; Wade caught one of the men, but he escaped before

Page 2 - OPINION AND ORDER

the police arrived.  The friend chased the Mercedes, but lost track of it.  The two then found some of Wade's belongings in a bush nearby.

A little over a week later, on September 30, Wade entered the hair salon where petitioner was working.  A customer at the salon overheard petitioner and Wade arguing.  Another customer heard Wade tell petitioner, "Man, I'm giving you fair warning."  State of Oregon v. Wilkins, 175 Or. App. 569, 572, 29 P.3d 1144 (2001).  Petitioner and Wade left the salon, walked to petitioner's Mercedes, and opened the trunk.  The same salon customer then heard Wade say, "Man, somebody had this car, either you or someone else was driving it."  Id.  Wade then left.

Petitioner returned to the salon for a short time, then left and drove off.  When he returned, he borrowed a cordless phone from one of the workers at the salon and called his girlfriend, Stephanie Dunn.  According to Dunn's testimony, petitioner told her a man and a woman had been "talking shit" about "the stuff he bought the other day."  Id.  Dunn testified petitioner said he "might have to drive them out somewhere secluded and take care of them because the nigger was threatening him."  Id.  Petitioner then told her they had come back and he would call later.

Sayles, one of the hair stylists in the salon, testified that she then heard two gunshots two or three seconds apart, looked out the window, and saw petitioner with a gun in his hand.  Petitioner then put the gun in his waistband and walked to his car, got in and drove away.  Sayles yelled, "Earl just shot somebody."  Id.  When she went outside, she saw a red van crashed into a telephone pole with two people inside who had been shot.  Brown, another salon employee, also saw the bodies in the van and tentatively identified one as the man with whom petitioner had

been talking.  Petitioner then called the salon a few minutes later and asked Brown if anyone had

mentioned his name.  She told him no, and then told him the people in the van were dead.

Petitioner replied, "I know."  Id. at 573.

Two other individuals who had witnessed the shooting testified in the state's case.  Cook

heard two gunshots, one or two seconds apart while driving down the street.  She saw a man to

her left, on the driver's side of the van, with his arm all the way in the driver's window.  When

he pulled his arm out, he had a gun in his hand.  He put the gun away, walked calmly and

casually to a blue Mercedes, and drove away.  Cook pulled over to call the police; she looked

back and saw that the van had moved across the street and had smashed into a telephone pole.

Holmes, who was in the car with Cook, also heard the shots and saw a man standing by the van.

He had his right hand in the van, pulled it out, put what appeared to be a gun in his waistband,

turned and headed casually toward a blue Mercedes.

When police arrived, they found Payton dead of a gunshot wound to her head.  They

found Wade in the driver's seat with a gunshot wound to his head.  He died at the hospital later

that day.

Shortly thereafter, a driver saw a light blue Mercedes pull across several lanes of traffic

on the Fremont Bridge, throw a paper sack out of the window of the car into the river, then pull

back through traffic and exit.  She reported what she had seen to the police, along with the

license plate number.  It was petitioner's license plate number.

Dunn testified that petitioner called her later that afternoon and told her he "did it."

Tr. 1326, ECF No. 17.[1]  A few hours later, he told her "he wasn't leaving no witnesses." Tr. 1330.

Petitioner testified at trial.  He testified that he bought stereo equipment from two men out of a house near what he later learned was Wade's apartment; one of the men said he was splitting from his wife and needed to get rid of his stuff.

On September 30, the man he later learned was Wade, entered the salon and asked who owned the blue Mercedes parked in front.  When petitioner said it was his, Wade accused petitioner of taking Wade's belongings.  Petitioner said he did not know Wade and did not know anything about a burglary.  Petitioner took Wade outside, opened up the trunk, and Wade accused petitioner of having his drugs and threatened to "fuck [him] up."  Tr. 1876.  Petitioner told Wade that others used his car and he would make some calls.  After an exasperated Wade left, petitioner testified he went to buy hair supplies for the day.

Petitioner returned to the salon, then went back out to his car to pick out some rap tapes to play in the salon.  He then talked with Dunn on the phone while sitting on the front steps.  He was about to go in when Wade approached him and asked whether petitioner had contacted any of his friends about Wade's stuff.  Petitioner suggested Wade write down his information so petitioner could contact him later.  Wade walked toward his van and opened the door.  Petitioner thought he was getting a business card.  A big truck drove by and petitioner moved out of the way, but when he turned around Wade was pointing a gun at petitioner's face.  Petitioner then testified:

---

[1]Unless otherwise noted, all transcript citations are to the trial transcript filed at ECF number 17.

Well, what happened next happened real fast, but I grabbed his hand, the gun, or I grabbed his hand and tried to move the weapon out of my face, because I felt like I was in danger at the time.  And I tried to move it out of my face, but he was way stronger than me.

So the weapon started coming back towards my face, and I tried to push, use his own strength against him and use a defense tactic, and he jerked his hand back away from me with his strength, and the gun went off when his arm went back, (indicating).

But quick as that happened–he had on like a nylon type windbreaker-type jacket, and my arm –my hands was on his arm still, so when he, when this –the explosion from the gun shocked me, and apparently it shocked him, and I was able to wrestle the gun out of his hand, but he didn't let go of the gun, he had the gun by the barrel, and he grabbed my arm right here by where I had got shot at [in an unrelated incident], and his hand covered my whole arm, and he had me.

And he started twisting my arm back like he was going to make me shoot myself, and at that time I was very fearful of my life, and I shot Mr. Wade.  I thought I shot him in his eye, but after the second shot he, um – he went back inside, went back inside the vehicle, but he was holding onto me, and I was leaning inside of the car because he had a grip on my arm.

And I asked him to like just let me go.  And when he let me go, I was kind of like in shock from everything.  And I was standing there with the gun in my hand, and then the car started up, and he drove off, and he pulled out into the street, and so I stepped back and put the gun in my pocket and I started walking towards my vehicle, and when as I was going back to my vehicle, I heard the engine from the mini-van accelerate like, voom, real fast, like that, and I picked up the phone and opened the door to my car, and then as I was getting in I heard a crash, and I turned around and saw that he had wrecked into the pole.

Tr. 1887-1888.

Petitioner testified he had to drive right by the van and saw Payton dead, hanging out of the window.  While he was on the Fremont Bridge, he began thinking about how Payton looked and he vomited.  He pulled over, got out of the car and threw a rag over the bridge.  But when he got back in the car, he saw the gun on the seat.  He testified, "[T]he first thing I thought about is now I know why people hate guns, because guns killed my nephew and killed the people, and I

Page 6 - OPINION AND ORDER

threw the gun out over the bridge." Tr. 1893.  He drove to his niece's house, took off his clothes "like I always do" and left on foot.  Tr. 1894.  He left his car because "I was in kind of like in shock, . . . [and] it was a nice neighborhood, so I started walking down the street so I could think clearly, try to figure out what, you know, what all this was about, because I didn't even know." Tr. 1894-95.  He ended up hailing a cab to his brother-in-law's house, but when he found no one home he took a cab to his sister's house.  He later returned to his niece's house where he arranged to have Dunn dropped off.  He testified Dunn was delusional, paranoid, and irrational, and she was drunk and high on crack.

In his case, petitioner also called two individuals, Elliott and Kindred, who allegedly witnessed the incident.  Both came forward months after the incident, testified to seeing an argument between Wade and petitioner at the van's window, saw Wade brandishing something, and heard gun shots.  Elliott was a customer of petitioner's.  Kindred conceded he reported his observations after being incarcerated with petitioner in the same jail.

On rebuttal, the state asked Dr. Larry Lewman, the medical examiner who had performed the autopsies of Payton and Wade, to assess the likelihood of petitioner's testimony in a medical context.  Dr. Lewman testified that the portion of petitioner's testimony describing Wade starting up the van and driving off was not "medically possible" after petitioner shot Wade.  Tr. 2075. Dr. Lewman described the shot as causing an "instantly incapacitating injury."  Tr. 2077.

Outside the presence of the jury, petitioner's defense counsel asked for permission to call Dr. Brady in surrebuttal.  The state objected because the defense had never mentioned Dr. Brady and had known about Dr. Lewman for a year.  The trial court agreed the information presented by Dr. Lewman was new information, but declined to permit the surrebuttal.  The jury was brought

Page 7 - OPINION AND ORDER

back in and defense counsel cross-examined Dr. Lewman.  Defense counsel confirmed Dr.

Lewman knew the van left the area and crashed into a telephone pole; that Wade was still alive

when paramedics arrived; that Wade's condition warranted an attempt at surgery; that Wade was

moving both upper extremities at the hospital; and that Dr. Lewman was not a neurologist.

        Again, out of the presence of the jury, defense counsel reiterated the need to call Dr.

Brady.  He[2] explained Dr. Lewman had left the jury with the impression that the events petitioner

had testified to were medically impossible, and that Dr. Brady did not share that opinion.

Defense counsel then went on to say,

> And to deny [petitioner] the opportunity to present surrebuttal denies him his
> rights to fair and impartial trial, his rights to present evidence, his rights to the
> effective assistance of counsel under Article I Section 11 of the Oregon
> Constitution and Amendment 6 and 14 of the United States Constitution, as well
> as his rights to due process and equal protection under the United States
> Constitution, Amendment 14, his rights to due process and due course of law
> under Article I Section 20 of the Oregon Constitution.
>
> . . .
>
> Additionally, Your Honor, the testimony by Dr. Lewman prompts the need to
> consult with and present evidence from someone specialized in neurology,
> because we're dealing with a function of the brain.  And for the same reasons and
> the same arguments submitted before, to deny our right to surrebuttal denies Mr.
> Wilkins those constitutional rights previously recounted for the court.

Tr. 2092-93.

        The trial judge ruled it was no "great surprise to anyone that we would be looking over

the issue of the medical aspects of the statements from both sides as to how this occurred.  I'm

not going to allow surrebuttal."  Tr. 2095.

_____

        [2]Two attorneys represented petitioner at trial, but the alleged errors at issue here relate to
only one of the attorneys.

Page 8 - OPINION AND ORDER

Defense counsel subsequently presented affidavits from Dr. Brady and from two neurologists, after the verdict and during the sentencing hearing. Dr. Brady, in his affidavit, stated, among other things, "While I think it medically unlikely that Mr. Wade started the van, put the vehicle in gear, and drove across the road after being shot, I do not believe this is an unequivocal medical impossibility, contrary to the position of Dr. Lewman." Resp. Ex. 127.

The two neurologists offered significantly stronger testimony. Dr. Jonathan Pincus opined, "It is medically likely that [Wade] was able to turn on the ignition immediately after being shot and to drive across the street[,]" and explaining the reasons for his conclusion. Resp. Ex. 125. Similarly, Dr. Reed Wilson provided an analysis of the injury's effect on Wade's brain and then reasoned, "I believe, therefore, that it is entirely possible for this patient to have had sufficient consciousness and motor control to have started the vehicle, put it in gear, and started to drive off, immediately after the gunshot wound and before the development of cerebral edema which eventually rendered him unconscious and brain dead." Resp. Ex. 126.

Petitioner appealed the trial judge's ruling precluding surrebuttal, along with other rulings. In a written opinion, the Oregon Court of Appeals held petitioner had preserved his objection to the court's ruling on Dr. Brady, but had not preserved his objection with respect to any neurologist's testimony. It concluded petitioner should have been provided the opportunity to present surrebuttal, but that the error was harmless. It then said, "We so conclude not only because of the strength of the state's case, but also–at least as significantly–because of the weakness of Brady's proposed surrebuttal testimony." Wilkins, 175 Or. App. at 584. The Oregon Supreme Court denied review.

Page 9 - OPINION AND ORDER

Petitioner sought post-conviction relief, arguing his counsel was ineffective in failing to object to testimony of a police officer, discussed further below, and when he mishandled the surrebuttal experts.  The post conviction relief ("PCR") court rejected petitioner's claims.  The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.

## LEGAL STANDARDS

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The state court's findings of fact are presumed correct, and a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d) is a "'guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'"  Hibbler v. Benedetti, 693 F.3d 1140, 1148 (9ᵗʰ Cir. 2012) (quoting Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011)) (other internal quotation omitted), cert. denied, 133 S. Ct. 1262 (2013).  "'[T]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold.'"  Id. at 1146 (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

**DISCUSSION**

In his Amended Petition for Habeas Corpus, petitioner alleges:  (1) ineffective assistance of counsel when defense counsel failed to respond to the state's rebuttal expert, Dr. Lewman; (2) ineffective assistance of counsel when defense counsel failed to object to improper character evidence given by a police officer; and (3) violation of his constitutional rights when the trial court precluded petitioner's surrebuttal evidence.

I.    Ineffective Assistance of Counsel in Responding to Rebuttal

Petitioner asserts his defense counsel was ineffective in responding to rebuttal because: (1) he failed to provide a neurologist's opinion as a proper offer of proof; and (2) he failed to obtain a continuance in order to consult with a neurologist.  Petitioner claims the post-conviction court's findings are not entitled to deference because the process was fundamentally flawed given that the PCR court's findings conflicted with the earlier Oregon Court of Appeals' decision.

I deal first with petitioner's argument for de novo review.  Petitioner contends the PCR court's conclusions are entitled to no deference because the court failed to follow "the law of the case" as presented by the Oregon Court of Appeals, effectively eliminating the full and fair process to which petitioner was entitled.  See Pet. Br. 24-31 (describing historic practice of habeas cases, legislative history of AEDPA, law of the case, and vertical stare decisis). Specifically, in addressing petitioner's claim, the PCR court agreed defense counsel had never explicitly asked for a continuance to obtain a neurologist's opinion, but inferred from the record that counsel wanted time to make an offer of proof.  Since no party litigated the appellate case as if defense counsel had asked for a continuance, petitioner clings to this statement made by the PCR court in arguing an unfair post-conviction process warrants less deference.

I note, however, the ambiguity of the PCR court's language–suggesting defense counsel's requests to make a proffer "could be considered" a request for a continuance.  Furthermore, the PCR court's ultimate conclusion was that petitioner did not prove "trial counsel's *failure* to request a continuance" was deficient.  Resp. Ex. 138, at 13 (emphasis added).  In other words, contrary to petitioner's argument, the PCR court never actually concluded trial counsel's statements constituted a request for a continuance.  Additionally, contrary to petitioner's argument, the PCR court recognized the Court of Appeals' finding that defense counsel had failed to preserve any arguments based on the neurologists' opinions.  The PCR court simply found defense counsel's failure to foresee Dr. Lewman's attack on petitioner's credibility was not unreasonable.  Id. at 11.  In short, I could not say the PCR court's fact-finding contradicted the Oregon Court of Appeals' decision and I review the claim under a deferential standard of review.

Accordingly, to prevail on a claim of ineffective assistance of counsel, petitioner must show both (1) that the attorney's performance fell below an objective standard of reasonableness; and (2) that the performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687, 688 (1984).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or what "might be considered sound trial strategy." Strickland, 466 U.S. at 689.  Reasonableness is judged as of the time of counsel's conduct, not in hindsight.  Id. at 689-90.  The reasonableness of counsel's actions "may be determined or substantially influenced by [petitioner's] own statements or actions."  Id. at 691.

A federal court reviews a state court's application of Strickland for reasonableness, not for correctness.  Hibbler, 693 F.3d at 1150.  The federal court does not ask "'whether counsel's actions were reasonable'" but "'whether there is any reasonable argument that counsel satisfied

<u>Strickland</u>'s deferential standard.'" <u>Id.</u> (quoting <u>Harrington</u>, 131 S. Ct. at 788). "Accordingly, a 'doubly deferential judicial review' applies to <u>Strickland</u> claims rejected by the state court." <u>Id.</u> (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411 (2009)).

The PCR court found defense counsel was not deficient for several reasons supported by the record:  the trial judge was not prepared to grant any request for a continuance even if it had been made since she denied defense counsel's request to call Dr. Brady in surrebuttal; she had previously denied a request for a California expert and would likely have denied funds for petitioner's Washington, D.C. neurologist; trial counsel's cross-examination was adequate; and trial counsel "had no reason to anticipate the prosecution's attack on Petitioner's description of how Wade's vehicle had traveled from the shooting site to the crash site" given that the focus of the case was on the shooting itself.  Resp. Ex. 138, at 11.

The PCR court then noted, "[f]or the jury to have been moved to acquit Petitioner based upon how the van moved across the street following the shooting, they would have had to ignore overwhelming evidence of Petitioner's lack of credibility and of his guilt." <u>Id.</u>  The jury would have had to ignore:  Dunn's testimony,[3] witnesses who testified to watching petitioner walk calmly away after the shooting, his call to the salon, petitioner's testimony about why he threw the gun over the bridge (which contradicted testimony of a disinterested witness who watched him throw the gun from the window of his car), and testimony that Wade and Payton did not like guns and did not own guns.   The PCR court concluded,

---

[3]Contrary to petitioner's understanding, the PCR court noted the extensive efforts defense counsel made to preclude, limit, and undermine Dunn's testimony given her history of lying and mental health problems.  Resp. Ex. 138, at 11.  Given the overwhelming evidence of guilt, however, Dunn's testimony was merely an afterthought.

> In the end, what was crucial for the jury was not whether Petitioner was truthful in his account of how the van moved after the shooting, but rather, whether Petitioner's account of the shooting was truthful.  The jury rejected that portion of Petitioner's story.  Given the totality of the circumstances, and having had the chance to judge for themselves the evidence and credibility of the numerous trial witnesses, there is little possibility that any neurologists' opinions contradicting Dr. Lewman's testimony would have tended to affect the jury's verdict in Petitioner's favor.

Id. at 12.

The PCR record supports these factual findings, and the PCR court's findings are neither contrary to nor an unreasonable application of Strickland.

Furthermore, my review of the criminal trial transcript confirms that counsel was not deficient and his conduct did not prejudice petitioner.  Because Dr. Lewman's testimony was not "pivotal evidence or directly contradic[tory to] the defense theory" of self-defense, defense counsel's failure to consult with or present the testimony of a neurologist was not deficient performance.  See Duncan v. Ornoski, 528 F.3d 1222, 1235 (9th Cir. 2008).  Similarly, I concur with the PCR court's conclusion that, given all of the evidence the state presented, petitioner was not prejudiced by any failure of defense counsel.  Thus, even under de novo review, petitioner fails to show counsel's performance was constitutionally deficient or that petitioner was prejudiced.

This ground for relief is denied.

II.    Ineffective Assistance of Counsel in Failing to Object to Character Evidence

During its rebuttal, the state called Officer Hollins to offer his opinion about petitioner's character for truthfulness.  Officer Hollins testified that four days before the shooting, he had arrested petitioner on a cocaine possession charge.  On the way to jail, Officer Hollins noticed

petitioner moving around in the back of the police car.  The officer asked petitioner if he had a

gun.  Petitioner responded, "No, I don't have a gun" and "If I had a gun, you wouldn't be taking

me to jail."  Officer Hollins then asked, "Are you saying that you'd shoot me?"  Petitioner

replied, "No, I wouldn't shoot you, because you're a brother doing your job."[4]  Officer Hollins'

encounter with petitioner lasted 30 minutes and he had never seen petitioner before.  Resp.

Ex. 120, at 2063-64.  The prosecutor then asked Officer Hollins:

> STATE:  [Y]ou had other conversations with Mr. Wilkins that day; isn't that
> correct?
>
> HOLLINS:  Yes, I did.
>
> STATE:  And based on those conversations, did you form an opinion as to
> whether Mr. Wilkins was a truthful person or not?
>
> HOLLINS:  Yes, I did.
>
> STATE:  And can you tell the members of the jury what your opinion is?
>
> HOLLINS:  My opinion was that he was untruthful.

Id.  Defense counsel did not object to this testimony.

Petitioner argues his counsel was ineffective for failing to object to Officer Hollins'

opinion about his truthfulness.  The propriety of such testimony depends on a foundation

"showing that the witness has sufficient acquaintance with the reputation of the person in the

relevant community or sufficient personal contact with the individual to have formed a personal

opinion.  The contact must have been sufficiently recent so that there will be a current basis for

the testimony."  State v. Caffee, 116 Or. App. 23, 840 P.2d 720 (1992).

---

[4]The trial court had previously ruled this testimony admissible as state of mind
evidence–that petitioner was willing to use a gun to avoid being taken into custody.  This ruling
is not challenged.

Defense counsel indicated he did not object because it "appeared to [him] that [Officer Hollins'] testimony was admissible" and he did not "want to risk enlarging what seemed like a small comment by Officer Hollins."  Resp. Ex. 134, Burris Aff. 2.  Petitioner claims this is deficient representation when the testimony violated the rules of evidence, given the single encounter between the two men, and when credibility was the central issue in the case.

The PCR court held the foundation was sufficient "because the encounter with Petitioner upon which the officer based his opinion, while short in duration, was of significant context and not too remote in time, having occurred just one year earlier."  Resp. Ex. 138, at 7.  The PCR court then considered the prejudice, if it is "somehow wrong in its findings above[.]"  Id.  It noted:

> [D]id the jury base its rejection of Petitioner's self-defense claim on Officer Hollins's opinion of whether he found Petitioner truthful?  Such a prospect is extremely unlikely, because the jury heard substantial other testimony–including Petitioner's own–which called Petitioner's credibility into question, quite apart from Officer Hollins's opinion.  For example, among other things, the jury heard evidence that Petitioner told a confidante shortly after the murders that he had committed them.  The jury heard witnesses testify that after hearing the shots, they saw Petitioner walk calmly with a gun to his car.  They heard Petitioner testify that he threw the gun in the river right after the killings.
>
> Moreover, it is unlikely that the jury's finding regarding credibility was based upon Officer Hollins's opinion of Petitioner's truthfulness relative to the encounter that transpired between the two.  Officer Hollins testified that Petitioner had said one thing–if Petitioner only had a gun, the officer would not be taking him to jail–and then Petitioner immediately contradicted the impact of that statement by saying something else–that Petitioner would not shoot the officer because the officer was a "brother doing your job."  That inconsistency alone, which contained no opinion evidence, reasonably raised serious doubts as to Petitioner's veracity.

Id.

Page 16 - OPINION AND ORDER

Petitioner points out State v. Maxwell, 172 Or. App. 142, 18 P.3d 498 (2001), which discusses the need to distinguish "between character traits and individual misdeeds" thus requiring something more than an individual act of untruthfulness. In addition, testimony about character requires a "recent and adequate acquaintance" with the person.

The PCR court's ruling that defense counsel was not deficient was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87. While Officer Hollins' contact with petitioner was not extensive, it was more than, for example, a single instance of failing to disclose criminal convictions on an employment application. See Maxwell, 172 Or. App. at 151 (insufficient contact for an opinion on character).

Even if defense counsel's failure to object was deficient, I find the PCR court's findings on the prejudice prong to be eminently reasonable. Despite petitioner's arguments about the especially trustworthy nature of a police officer's testimony, as I explained above petitioner's own testimony undermined his credibility far more than any police officer could. Furthermore, as the PCR court reasonably pointed out, petitioner's calm walk back to his car after the shooting, Dunn's testimony about petitioner's statements to her, and Officer Hollins' testimony repeating petitioner's comments about a gun contradicted petitioner's self-defense theory.

Since the PCR's court's application of Strickland was neither contrary to, nor an unreasonable application of clearly established law, I deny relief on this ground.

III.    Whether the Trial Court's Ruling Precluding Surrebuttal Violated the Constitution

Petitioner argues the trial court's ruling precluding surrebuttal violated his Sixth and Fourteenth Amendment rights to present a defense. Washington v. Texas, 388 U.S. 14, 19

(1967) (right to present a defense is a "fundamental element of due process of law").  Petitioner

contends I must assess the error pursuant to Brecht v. Abrahamson, 507 U.S. 619 (1993) to

determine whether it had a "substantial and injurious effect or influence in determining the jury's

verdict" using several factors set out in Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

The state responds that petitioner procedurally defaulted this claim and, in addition, the

claim lacks merit.  The state also disputes that the Van Arsdall factors are relevant to the

analysis.

Generally, a state prisoner must exhaust all available state court remedies either on direct

appeal or through collateral proceedings before a federal court may consider granting habeas

corpus relief.  28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by

"fairly presenting" her claim to the appropriate state courts at all appellate stages afforded under

state law, including a state supreme court with powers of discretionary review.  Baldwin v.

Reese, 541 U.S. 27, 29 (2004); Casey v. Moore, 386 F.3d 896, 915-16 (9th Cir. 2004).

When a state prisoner fails to exhaust his federal claims in state court, and the state court

would now find the claims barred under applicable state rules, the federal claims are procedurally

defaulted.  O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999).  If a state prisoner procedurally

defaults on a claim in state court, a federal court will not review the claim unless the state

prisoner shows cause for the procedural default and actual prejudice from it, or that "failure to

consider the claims will result in a fundamental miscarriage of justice."  Wainwright v. Sykes,

433 U.S. 72, 87 (1977); Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Defense counsel properly identified the federal constitutional violations in his objection

to the trial judge's decision precluding Dr. Brady's surrebuttal testimony.  The state relies on

cases prohibiting "drive by" citations of federal constitutional provisions in the exhaustion

context, but they arose in the appellate context rather than in the fast-paced trial environment.

See Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005); Shumway v. Payne, 223 F.3d 982,

987 (9th Cir. 2000).  I conclude trial counsel adequately preserved the error.  See, e.g. Saner v.

Nooth, Civ. No. 07-1196-CL, 2008 Wl 5046175, at *3 (D. Or. Nov. 21, 2008) (close question,

but closing argument was sufficient to preserve); Best v. Lampert, Civil No. 05-1488-PA, 2007

Wl 2746931, at *3 (D. Or. Sept. 18, 2007) (oral motion for continuance mentioning

constitutional right to counsel was sufficient).

       In addition, appellate counsel fully briefed the issue for the Oregon Court of Appeals.

Although the state argued at the time that the Court of Appeals should not consider the claim,

and the court resolved the issue on state statutory grounds alone, I could not say the court

declined to review the federal constitutional argument because defense counsel failed to preserve

it at the trial level.  Johnson v. Williams, __ U.S. __, 133 S. Ct. 1088, 1096 (2013) ("When a

state court rejects a federal claim without expressly addressing that claim, a federal habeas court

must presume that the federal claim was adjudicated on the merits–but that presumption can in

some limited circumstances be rebutted.").

       Nevertheless, for all the reasons claim one fails, I deny habeas relief; the error did not

have a "substantial and injurious effect" on the jury's verdict.  Brecht, 507 U.S. at 622.  This is

true regardless of whether I apply the factors petitioner presses.  Those factors are:  (1) the

importance of the witness' testimony in the prosecution's case; (2) whether the testimony was

cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony

of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.  Van Arsdall, 475 U.S. at 684.

While Dr. Lewman's testimony was helpful in discrediting petitioner, the doctor's testimony was not central to the state's case.  As the Oregon Court of Appeals commented, "[I]n the totality of the circumstances of this case, the credibility of defendant's account of how the van moved across the street was not a focus or a significant theme of the prosecution."  Wilkins, 175 Or. App. at 584.  It is true Dr. Lewman's testimony was not cumulative and there was no contradictory testimony.  However, defense counsel adequately cross-examined Dr. Lewman, even without another neurologist's opinion.  Finally, as I set forth in detail above, and as the Oregon Court of Appeals recognized, the state's case was very strong.  As a result, I can confidently conclude the trial court's error in precluding surrebuttal did not have a "substantial and injurious effect or influence in determining the jury's verdict."

I deny this ground for relief.

///

///

///

///

///

Page 20 - OPINION AND ORDER

**CONCLUSION**

The Amended Petition for Writ of Habeas Corpus [30] is denied and this proceeding is

dismissed with prejudice.  Because petitioner has not made a substantial showing of the denial of

a constitutional right, a certificate of appealability is denied.  See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this _____4th_____ day of December, 2013.


_/s/ Garr M. King_____
Garr M. King
United States District Judge